# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

CHERYL BOMBASSEI,

      Plaintiff,

v.

                                     Case No. 22-10593
                                     Hon. Denise Page Hood

THE LINCOLN NATIONAL
LIFE INSURANCE COMPANY,

      Defendant.

_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [#17] AND DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [#18]

## I.     INTRODUCTION

On March 21, 2022, Plaintiff Cheryl Bombassei brought suit against Defendant The Lincoln National Life Insurance Company.  Plaintiff is seeking long term disability benefits after Defendant determined that she did not suffer from a disability under the terms of her policy.  On January 17, 2023, Plaintiff filed a Motion for Summary Judgment, ECF No. 17, and Defendant filed a Motion for Judgment on the Administrative Record. ECF No. 18.  Both motions have been fully briefed.  For the reasons that follow, Plaintiff's motion is granted and Defendant's motion is denied.

## II.    BACKGROUND

Plaintiff, who worked for more than 20 years as a nurse and a nurse practitioner, was covered by an employer disability plan.  She stopped working on September 4, 2018, and she has never returned to work.  Plaintiff stopped working due to a shoulder injury, rheumatoid arthritis, and extreme daytime sleepiness that was diagnosed in 2014 as narcolepsy.  Her treating neurologist, Dr. Trock, opined that she was incapable of work.

When Plaintiff stopped working, she applied for and ultimately was approved for a 26-week short-term disability leave.  Plaintiff then transitioned to the long-term disability plan, where she was considered "disabled" because she was unable to perform the main duties of her "Own Occupation," as defined below. Plaintiff received long-term disability benefits for a 24-month period that ended on March 5, 2021.

One condition of receiving the long-term benefits was that Plaintiff had to seek other available benefits, including Social Security Disability.  Plaintiff applied for Social Security Disability, and she was found to have severe impairments consisting of rheumatoid arthritis, left shoulder disorder, narcolepsy, and depression. The Social Security Administrative Law Judge ("ALJ"), who consulted impartial vocational expert Harry Cynowa, concluded that Plaintiff had a less-than-

sedentary functional capacity, namely because she must lay down 20% (2 hours) of the workday. The ALJ ruled in relevant part:

> […]The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except claimant requires the ability to lay down for up to 2 hours during the workday. […] Considering the claimant's age, education, work experience and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that claimant can perform […] Even if the claimant had the residual functional capacity for the full range of sedentary work, a finding of "disabled" would be directed by Medical-Vocational Rule 201.14. […].

*Id*. On March 24, 2020, the Administrative Law Judge found Plaintiff unable to perform any other job in the economy.

On June 18, 2020, Defendant notified Plaintiff that it was reviewing her long-term disability claim because she was approaching 24 months of being qualified under the policy. The policy definition of "disabled" changes after 24 months of coverage from inability to perform main duties of "Own Occupation" to "Any Occupation." On December 30, 2020, Defendant informed Plaintiff that it was terminating coverage beyond March 5, 2021, the end of her Own Occupation period.  Defendant denied Plaintiff's (and Plaintiff counsel's subsequent) appeal of Defendant's determination to terminate coverage.

Under the policy, certain relevant terms have the following definitions:

OWN OCCUPATION PERIOD:

A period beginning at the end of the Elimination Period and ending 24 months later for Insured Employees.

DISABILITY or DISABLED:

Total Disability or Partial Disability.

MAIN DUTIES of MATERIAL AND SUBSTANTIAL DUTIES:

Main Duties include those job tasks:

1.  as described in the U.S. Department of Labor Dictionary of Occupational Titles; and

2.  as performed in the general labor market and national economy. Main Duties are not limited to those specific job tasks as performed for a certain firm or at a certain work site.

TOTAL DISABILITY or TOTALLY DISABLED:

1.  During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.

2.  After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow.

4

The loss of a professional license, an occupational license or certification, of a driver's license for any reason does not, by itself, constitute Total Disability.

## III.   LEGAL STANDARD

Section 1132 is the civil enforcement provision of ERISA which states:

A civil action may be brought ... by a participant or beneficiary ... to recover benefits due to [her] under the terms of [the] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).  A denial of benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 103, 115 (1989).  In this case, the parties agree that the Court's review of Defendant's denial of disability benefits is to be reviewed *de novo*.

Under a *de novo* review, "the role of the court reviewing a denial of benefits is to determine whether the plan administrator made the correct decision." *Hoover v. Provident Life and Acc. Ins.*, 290 F.3d 801, 808 (6th Cir.2002) (internal quotations omitted). First, the Court must decide whether the administrator properly interpreted the Plan. *Id.* at 809. Applying general principles of contract law, the Court must read the Plan provisions "according to their plain meaning in

5

an ordinary and popular sense" and construe any ambiguities in the Plan against the drafter. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).

Second, relying only on the record before the plan administrator at the time of its decision, the Court must decide whether the insured was entitled to benefits under the proper interpretation of the Plan provisions. *Hoover*, 290 F.3d at 809.

## IV.   ANALYSIS

### 1. Parties' Arguments

Plaintiff contends that, as of March 5, 2021 and continuing to today, she has not been able to perform each of the Main Duties of any occupation which her training, education or experience will reasonably allow. For this reason, she maintains that she is "totally disabled" as defined by the policy. There are two steps of this analysis – first, what, if any, ability to perform does Plaintiff have in light of her medical conditions. Second, do her residual abilities, training, education and experience align with the main duties of any potential occupation in the economy.  Plaintiff claims she has no occupational functional capacity because her residual abilities are less than required for any job in the economy, such that she satisfies the policy's definition of total disability.   The parties have two different views of Plaintiff's physical limitations.

Plaintiff argues that she has a long medical history of uncontrolled rheumatoid arthritis and severe narcolepsy, all of which is supported by objective evidence.  It is undisputed that, in 2014, Plaintiff was diagnosed with excessive daytime sleepiness and narcolepsy without cataplexy (type 2 narcolepsy). *See* ECF No. 17, Ex. A (Troy Sleep Center 12/18/2014 - MSLT[1] report: "The mean sleep latency to all naps of less than 5 minutes and presence of REM stage of sleep in more than 1 nap make the diagnosis of narcolepsy more likely." Citing LIN000205-06; LIN002173.).  Plaintiff states that narcolepsy is incurable, so there is no reason to test for it again after a diagnosis.   Plaintiff also notes that Defendant's final reviewer (Dr. Reilly) agrees there is a diagnosis of narcolepsy.

Imad M. Obeid, MD opined that daytime naps are necessary for Plaintiff to function, AR, LIN000293-298; 687-690 (*see also* and Gary L. Trock, MD, at 504). A psychologist, Robin Billing, PhD, indicated on October 1, 2019 that Plaintiff would be expected to be absent four or more days a month and be off task 20% of the workday. AR, LIN000207-08.  Plaintiff also has a Social Security functional

---

[1] In the multiple sleep latency test ("MSLT"), a person is given 4-5 opportunities to sleep every two hours during normal wake times. The specialist uses the test to measure the extent of daytime sleepiness (how fast the patient falls asleep in each nap, also called sleep latency), and also how quickly REM sleep begins. A positive MSLT is obtained when the patient falls asleep with a mean sleep latency below 8 minutes in the naps, and had at least no more than 1 nap (for idiopathic hypersomnia) or 2 naps (for narcolepsy diagnosis) where REM sleep was reached. https://stanfordhealthcare.org/medical-tests/m/multi-sleep-latencytest.html#:~:text=A%20positive%20MSLT%20is%20obtained,where%20REM%20sleep%20was%20reached

restriction that she must have the ability to lay down for up to two hours during the workday, AR, LIN000339, which renders her disabled for purposes of the Social Security Administration. *Id*. at LIN000343.   Plaintiff contends this restriction would render her disabled from "any occupation" under the policy, including a sedentary clerical occupation.

Defendant questions the validity of the Social Security determination because it was made in March 2020, a year before the claimed current disability period commenced, and was based on an October 1, 2019 letter from a psychologist (who the ALJ believed to be a neurologist) who had not seen Plaintiff since November 2018.

Plaintiff's self-reports, and reports of her daughter and a co-worker, indicate that since 2018 she has falling asleep at work, with patients, and at home, and that she has been "controlling" her narcolepsy with multiple daytimes naps daily. Defendant argues, however, that the reports of her daughter and co-worker were written in 2018, yet her fatigue, arthritis pain, and swelling had significantly decreased by 2020-21, as reflected in her comments to treating physicians regarding treatment with Enbrel and Modafinil.

Defendant also argues that testimonials from friends and family members do not constitute proof required to prove disability. *Childers v. United of Omaha Life*

*Ins. Co.,* 2013 WL 683498, at *27 (S.D. W. Va. 2013) (letters of support describing "the author's observation of the deterioration of the [claimant's] condition" do not provide "the type of evidence required by [ERISA plans] to satisfy proof."); *Withey v. Met. Life Ins. Co.*, 1994 WL 731584, at *4 (D. Colo. 1994) (to rely on "self-serving, uncorroborated testimonials of [claimant] and her several friends" would be "beyond the bounds of reasonable judgment").

Plaintiff argues that her treating physician's opinions regarding her self-reported symptoms should be granted deference over file reviewers (*i.e.*, Defendant's doctors). Citing *Kalish v. Liberty Mut./Liberty Life Assur. Co.*, 419 F.3d 510, 508 (6th Cir. 2005); *Combs v. Reliance Standard Life Ins. Co.*, No. 2:08-cv-102, at *20 (S.D. Ohio Apr. 13, 2012) (self-reports to treating physicians are acceptable proof of disability in instances where the only proof of a symptom is a self-report that is medically related to the underlying condition).

Defendant contends that Plaintiff is simply attempting to shift the burden of proving that she is disabled under the "any occupation" standard – that she is "unable to perform each of the Main Duties of Any Occupation which . . . her training, education or experience will reasonably allow." Citing LIN000094. Defendant asserts that none of Plaintiff's treating physicians opined that her narcolepsy, arthritis, or any other diagnosis prevented her from working in a

sedentary occupation during the relevant time period. To the contrary, Defendant states that Plaintiff's medical records show that she had significant improvement in her anemia, arthritis, and narcolepsy control by 2020 and, by 2021, none of the restrictions and limitations imposed by her treating physicians would preclude her from sedentary work.

Defendant represents that it sought new Attending Physician Statements ("APS") from September 2019 to February 2020 from: (a) Dr. Birkel (the rheumatologist who opined in February, 2019 that Plaintiff could not work for 3 months when initially diagnosed with inflammatory arthropathy); (b) Dr. Dhar (her current rheumatologist); (c) Dr. Pollina (pain management); and (d) Dr. Pearson (her family physician and original provider for arm pain and anxiety). Citing LIN000058-59, 000746-752, 000848-854, 000905-911, 001073-79. Defendant further represents that none of these physicians returned an APS as requested. Dr. Trock also did not provide any restrictions after September 1, 2019, and he declined to comment on current limitations and/or restrictions when Dr. Reilly contacted him on May 26, 2021. Dr. Obeid, Plaintiff's pulmonologist, also never provided any opinion that narcolepsy precludes Plaintiff from working.

Defendant argues that the February 16, 2022 letter from Kerry Nathan ("Nathan"), PA-C, at the B.G. Tricounty Neurology & Sleep Clinic, does not

suggest that Plaintiff cannot work. Defendant states that, although Nathan lists Plaintiff's diagnoses of narcolepsy, rheumatoid arthritis, T9 compression fracture and depression, diagnoses do not constitute a disability. *Rose v. Hartford Fin. Servs. Grp., Inc.*, 268 F. App'x 444, 453-54 (6th Cir. 2008) (evidence of diagnosis is not enough to demonstrate disability, without evidence of functional limitations); *Minutello v. Hartford Life & Acc. Co.*, 964 F.Supp.2d 491, 508 (W.D. Pa. 2013) (diagnosis does not equate to disability). Defendant also suggests that, because Nathan stated that Plaintiff "likely will benefit from planned naps throughout the day as well," AR, LIN000181, that is "far from proof of disability from Any Occupation." Defendant notes that Plaintiff informed Dr. Obeid in 2021 that her narcolepsy "feels better controlled with Modafinil 1 mg twice daily," yet Nathan does not mention Modafinil or that she reviewed other medical records before drafting her letter.

Defendant argues that Plaintiff's failure to offer physician support or opinion in 2020-22 that narcolepsy restricted her work abilities, there was no reason for Defendant to have a sleep study specialist review her records. Citing *Chester v. Mut. of Omaha Ins. Co.*, 2017 WL 3776523, at *7 (E.D. Mich. 2017) (Hood, J.) ("In the absence of anyone indicating that Plaintiff was Disabled, Defendant . . . had no reason to discuss why it was rejecting and rebutting Plaintiff's arguments

that she is disabled from psychiatric conditions due to her diagnosis of major depressive disorder."). Defendant contends this is especially true given that her treating physicians' records reflect that Plaintiff's arthritis and narcolepsy symptoms improved with medication, records that are inconsistent with Plaintiff's self-reports. Defendant cites Dr. Baron's March 25, 2021 notes (and further 2021 notes) that indicate Plaintiff has no synovitis (joint inflammation), there has been no left shoulder pain for awhile, and arthritis conditions are improved on Enbrel. AR, LIN000351-55.

Defendant also relies on Dr. Carr's notes from a December 30, 2020 visit that Plaintiff could stand for 60 minutes, could sit for hours, and could walk for 30 minutes; he was also optimistic that Plaintiff could recover from her compression fracture. Physical therapy records from January 11, 2021 also make no mention of pain from prolonged sitting, only from prolonged laying.

Defendant argues that Plaintiff's reliance on Social Security presumptions are not helpful because they do not apply in this case. "First, it is well settled that plan administrators—and by extension, reviewing courts—are not bound by SSA determinations." *Tranbarger v. Lincoln Life & Annuity Co. of N.Y.*, 2022 WL 912244, at *9 (S.D. Ohio Mar. 29, 2022) (upholding insurer's determination under *de novo* review despite conflicting SSA determination) (citing *Bustetter v.*

*Standard Ins. Co.*, 529 F.Supp.3d 693, 707 (E.D. Ky. 2021), *aff'd*, 2021 WL 5873159 (6th Cir. Dec. 13, 2021) (citing *Cox v. Std. Ins. Co.*, 585 F.3d 295, 303 (6th Cir. 2009)). Defendant contends that the Court "may depart from the SSA's conclusion, especially when the evidence relied upon is different and it rationally explains its departure." *Tranbarger*, 2022 WL 912244 at *10, citing *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 407 (6th Cir. 2022) (departure from SSA disability finding was rational where Committee relied upon evidence created after the SSA decision).

Defendant argues that the ALJ's RFC finding that Plaintiff would need to lay down for up to two hours during the weekday and be off task for 20% of the workday: (a) was based on a 2019 opinion that the ALJ erroneously thought was issued by a neurologist but actually was issued by a psychologist (Robin Billings); and (b) is not supported by current medical evidence, as discussed above/below. Defendant further argues that the ALJ's opinion, which was based in part on Plaintiff's advancing work age (54 at the date of disability) and assumes that her age "may seriously impair [her] ability to adjust to other work," does not help Plaintiff meet her burden of showing that she "is unable to perform each of the Main Duties of any occupation which . . . her training, education or experience will reasonably allow."

Plaintiff argues that Defendant's reviewers did not consider her self-reported symptoms, contrary to the requirement that "file reviewer . . . perform a comprehensive, rather than selective, review of the records when rejecting claimant's self-reported symptoms." *Bennetts v. AT&T Integrated Disability Serv. Ctr.*, 25 F.Supp.3d 1018, 1031 (E.D. Mich. 2014) (citing *Ebert v. Rliance Standard Life Ins. Co.*, 171 F.Supp.2d 726, 740 (S.D. Ohio 2001)).  Plaintiff accurately notes that the last two reviewers consulted by Defendant did not consider reports by her and others regarding excessive sleepiness, AR, LIN000175-80, 502, 536, relying only on medical records without context. Citing AR, LIN000188-92.  Plaintiff maintains that these reports evidence that she was suffering to stay awake throughout the (work)day, was exhausted, and fell asleep while working with patients and when talking to her daughter.

Plaintiff disputes Defendant's suggestion that, because she worked for years in that manner, she can continue to work.  Plaintiff argues that there is no occupation in the economy would allow an employee to nap two hours per day. S*ee Logan v. Comm'r of Soc. Sec.*, 13-CV-12807, ECF No. 19, at *8 (E.D. Mich. May 29, 2014). Plaintiff contends that the fact that she took naps as best she could while at her previous employer is not indicative that any other employer would accept this.

Plaintiff also insists that her diagnosis of rheumatoid arthritis is supported by diagnostics, is not under control, and, according to Dr. Trock, its advancement only serves to increase the severity of her narcolepsy symptoms. AR, LIN000305.

Defendant maintains that its reviewers were the only medical professionals who reviewed the entirety of the medical record and should be given great weight. Citing *Beltman v. Sun Life Assurance Co.*, 2019 WL 1614584, at *8 (W.D. Mich. Mar. 29, 2019) (giving greater weight to consulting practitioners who reviewed all medical records before offering their assessments). Defendant asserts that the reviewers were able to review and analyze all the physical examinations in the record, and another normal examination would have added nothing to their analysis.

Sixth Circuit precedent does not dictate that there needs to be a precise measurement of restriction, but rather that there needs to be an objectively diagnosed underlying medical condition. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 382 (6th Cir. 1996). Subjective reports of symptom severity need to be considered to the extent they relate to the underlying medical condition. *Cooper v. Life Ins. Co.*, 486 F.3d 157, 173-74 (6th Cir. 2007). Making credibility determinations of claimant-reported symptoms without the benefit of an exam should generally result in the administrator's decision being overturned. *Calvert v.*

*Firstar Finance, Inc.*, 409 F.3d 286, 296 (6th Cir. 2005); *Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 393-96 (6th Cir. 2009).

Plaintiff asserts that there is no diagnostic examination that exists which can verify the credibility of her self-reports of daytime sleepiness. She argues that the best that medical science can offer - the Polysomnography – ruled out other causes for daytime sleepiness, AR, LIN000307-08.  The MSLT report concludes that narcolepsy is likely the cause of daytime sleepiness, AR, LIN002173, and the Epworth Sleepiness Scale measured 17, which is indicative of significant hypersomnia. AR, LIN000670.  Plaintiff claims that these measurements were all attained and indicate narcolepsy as the cause of the sleepiness, just as her self-reports are supported by a long medical record. AR, LIN000175-180, 502, 536.

Defendant's medical director discarded the opinion of Dr. Dennis-Yawingu that supported a finding of sedentary strength level and a finding of disabled in favor of Dr. Sheppard, who did not consider Plaintiff's narcolepsy or rheumatoid arthritis and concluded Plaintiff had a light strength functional capacity. AR, LIN000602-20.  Plaintiff states that Defendant's vocational expert's internal files note that Dr. Sheppard erred by indicating that Plaintiff could return to work at her own occupation (a light occupation), because her listed restrictions could not allow performing such work. AR, LIN00049-50, LIN000592-95.  Plaintiff further argues

that Dr. Reilly initially failed to address Plaintiff's narcolepsy when issuing his report, then placed an addendum that offered little explanation for the restrictions he considered (even stating that Plaintiff could "stand at will").

Plaintiff contends that she does not have a transferrable occupation in registered nursing to sedentary clerical occupations of "Compiler" and "Scheduler, Maintenance." She insists that the duties for the occupational group "Clerical and Sales" are not reasonably similar to her past work history as a medical professional, nor do they have a matching MPSMS Code or Work Field to Plaintiff's prior occupations.

Defendant counters that Plaintiff has provided no evidence to support these statements, nor does the policy require that Plaintiff have prior experience in a transferrable occupation. Defendant states that the policy requires only that Plaintiff can obtain the expertise in light of her past experience, meaning that she can "perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow." Defendant argues that Ms. Grumet identified numerous transferable abilities gained from Plaintiff's experience and education as a nurse, such as data abilities including compiling, computing, copying and comparing. Defendant states that, as a nurse, Plaintiff was responsible for gathering patient data and history, measuring medications/treatments,

writing/prescribing medical orders, and monitoring patient condition in response to treatments and procedures.

Defendant argues that Plaintiff's expert, James Fuller, never asserted in his report that Plaintiff's experience and education is not transferable to these occupations and, instead, opined that Plaintiff has severe limitations not identified by any of Plaintiff's medical providers in 2020-22.   Defendant relies on a Transferable Skills Analysis ("TSA") from Vocational Rehabilitation Counselor Tracie Grumet, and using the Dictionary of Occupational Titles, Ms. Grumet found a number of gainful occupations consistent with Dr. Shepard's restrictions and limitations. AR, LIN000381-384.  An updated TSA was prepared by Grumet, and she identified a number of sedentary positions that Plaintiff had the skills to perform, consistent with Dr. Reilly's restrictions and limitations. LIN000193-194. Defendant argues that Plaintiff could, and does not dispute that she could, sit constantly with the ability to stand at will or that the sedentary occupations identified in the TSAs allowed as much.

   2. *Analysis*

The Court finds that Plaintiff has a Total Disability under the policy.  Like the Social Security Administration, the Court concludes that Plaintiff has, and continues to have, severe impairments consisting of rheumatoid arthritis, left

shoulder disorder, depression, and especially narcolepsy.  The Court believes that Plaintiff has demonstrated that she suffered (and suffers) from narcolepsy to the extent that she cannot perform "the Main Duties of any occupation which . . . her training, education or experience will reasonably allow."  The reports of Plaintiff's daughter and co-worker, although several years old, that Plaintiff fell asleep at work, with patients, and at home is unrebutted.  The diagnosis of narcolepsy is further supported by the MSLT report, which concluded that narcolepsy was the likely cause of daytime sleepiness, and the results of her Epworth Sleepiness Scale that indicated significant hypersomnia. Defendant offers no tests that counter those results, nor any physician who has conducted an in-person examination and evaluation of Plaintiff.

Plaintiff's doctors, including Dr. Obeid, have opined that daytime naps are necessary for Plaintiff to function, and Dr. Billings indicated that Plaintiff would be expected to be absent four or more days a month and be off task 20% of the workday.   The Court considers the February 2022 letter from Dr. Nathan substantial evidence of Plaintiff's continued need to take "planned naps throughout the day."  All of these things are consistent with the Social Security functional restriction reflects that Plaintiff must be able to lay down for up to two hours during the workday.  And, if Plaintiff requires such naps, she is inhibited from

performing the Main Duties for pretty much any occupation, as one fundamental condition for performing an occupation is being awake. *Logan v. Comm'r of Soc. Sec.*, 13-CV-12807, ECF No. 19, at *8 (E.D. Mich. May 29, 2014).

The Court does not find it critical that the Social Security Administration believed that it was a neurologist rather than a psychologist who indicated that Plaintiff needs up to two hours of naps per day.  This is especially true as the evidence in the record reflects that Plaintiff's treating neurologist, Dr. Trock, believes that Plaintiff is disabled.  Dr. Trock also opined that Plaintiff's rheumatoid arthritis, which does not seem to be under control, only serves to increase the severity of Plaintiff's narcolepsy conditions.

The Court finds it notable that the reports and opinions of the physicians Defendant identifies lack any in-depth analysis regarding Plaintiff's narcolepsy; in fact, most fail to even acknowledge or discuss Plaintiff's narcolepsy.  Many of those doctors only reviewed Plaintiff's file(s) and did not see or evaluate Plaintiff. Even Dr. Reilly, who initially failed to address Plaintiff's narcolepsy, ultimately acknowledged a diagnosis of narcolepsy yet indicated that Plaintiff could "stand at will," a suggestion that has no support in the record and undermines the credibility of his conclusions.

The Court recognizes Defendant's contention that it did not receive new Attending Physician Statements from Dr. Birkel, Dr. Dhar, Dr. Pollina, and Dr. Pearson.  None of those physicians, however, treated Plaintiff's narcolepsy, which is the critical basis for finding that she is totally disabled. And, to the extent that any of Plaintiff's physicians failed to update Defendant regarding Plaintiff's narcolepsy, the Court is not troubled because there is no evidence that narcolepsy is curable and/or goes into remission. *See, e.g.,* https://www.nhs.uk/conditions/narcolepsy/. The Court also finds insignificant the fact that Dr. Obeid, a pulmonologist, did not opine that narcolepsy precludes Plaintiff from working; Plaintiff saw Dr. Obeid for her rheumatoid arthritis, not for her narcoleptic condition.

For the reasons stated above, the Court concludes that Plaintiff is has a Total Disability under the policy and is entitled to summary judgment in her favor. Defendant's motion for judgment on the administrative record is denied.

## V. CONCLUSION

Accordingly,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment [ECF No. 17] is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion for Judgment on the Administrative Record [ECF No. 18] is DENIED.

IT IS FURTHER ORDERED that Defendant's decision to terminate Plaintiff's benefits is reversed, retroactive to March 6, 2021.

IT IS FURTHER ORDERED that Defendant shall continue to honor Plaintiff's award of benefits, including the award of past due benefits and interest on past due benefits, as well as pay Plaintiff for future benefits as long as she continues to meet the definition of Total Disability under the policy.

Dated: May 23, 2023                           s/Denise Page Hood
                                              UNITED STATES DISTRICT COURT